MRS. ANNIE SNYDER *v.* THE SUPREME RULER OF THE
FRATERNAL MYSTIC CIRCLE.[1]

(*Knoxville.*    September Term, 1909.)

1. **INSURANCE.** Wife named as beneficiary under a fraternal
benefit certificate and continuing payments after divorce is en-
titled to insurance, when; waiver.

Where the charter of a social and benevolent corporation de-
clared its object to be to unite fraternally persons of proper
age and character for beneficial and protective purposes, to pro-
vide for the payment to its members, or their families, wid-
ows, heirs, blood relatives, or other dependents, benefits in case
of death, without any restrictive words, without any affirma-
tive provision that the benefit fund should be appropriated to
none other than those enumerated, and without any provision
for the forfeiture of a benefit certificate payable to the wife
of a member upon her obtaining a divorce from the member,
the divorced wife is entitled to recover on the certificate, upon
the death of the member, where the certificate was previously
issued to the member for the benefit of his wife who subsequently
obtained a divorce, and who was thereafter induced by the rep-
resentations of the highest executive officer of the corporation,
made by him with knowledge of the facts, to continue the pay-
ment of the assessments and dues on the unchanged certificate,
the receipt of which by the corporation, with knowledge of
the divorce, operated as a waiver of the rule or law of the
corporation.    (*Post, pp.* 251-264.)

Cases cited and approved: Lane v. Lane, 99 Tenn., 639; Man-
ley v. Manley, 107 Tenn., 191; Alfsen v. Crouch, 115 Tenn., 352;
Maneely v. Knights, 115 Pa., 305; White v. Brotherhood, 124

---

[1] For effect of divorce on wife's right to insurance on her hus-
band's life, see note to Overhiser v. Mutual Life Ins. Co. (Ohio),
50 L. R. A., 552.

Snyder v. Mystic Circle.

Iowa, 293; Sheehan v. Journeymen, 142 Cal., 489; Society v. Blue, 120 Ill., 121; Lindsey v. Society, 84 Iowa, 734; Story v. Association, 95 N. Y., 474.

2. **SAME. Same. Fraternal benefit insurance corporation may waive its by-law as to divorce by the reception of assessments and dues with full knowledge.**

Where a by-law of a social and benevolent corporation provided that if the beneficiary designated in its benefit certificate is a husband or wife of the member and they (the member and beneficiary) should be divorced, then the benefit shall be payable to a certain other class of persons, and where the beneficiary is the wife of the member, and she afterwards obtains a divorce from the member, and thereafter informed the highest executive officer of the corporation of the fact, and that she had the certificate in her possession whereupon, such officer induced her, by his representations as to her rights thereunder, to continue the payment of the assessments and dues on the unchanged certificate, the receipt of which by the corporation, with knowledge of the divorce, operated as a waiver of such by-law, because the corporation which made the by-law could waive it. (*Post, pp.* 258-261, 263, 264.)

3. **SAME. Same. Same. Fraternal benefit insurance corporation refusing payment upon one distinct ground is estopped to insist upon a forfeiture of the certificate upon another ground.**

Where a social and benevolent corporation declined to pay a benefit certificate on the sole ground that the member's "death was due solely and wholly to the excessive use of narcotics, alcoholic, vinous, and malt liquors, and the excessive use of morphine and other opiates," in violation of a rule of the corporation, it will be estopped in the beneficiary's suit thereon to assert or insist on a forfeiture of the certificate because the wife of the member, who was designated as the beneficiary, thereafter obtained a divorce, as well as to make other defenses. (*Post, pp.* 264, 265.)

Snyder v. Mystic Circle.

Cases cited and approved: Insurance Co. v. Thornton, 97 Tenn., 1; Insurance Co. v. Hancock, 106 Tenn., 513; Smith v. Insurance Co., 107 Mich., 270; McCormick v. Insurance Co., 163 Pa., 184.

4. **ESTOPPEL.** Ground for conduct before suit cannot be changed after suit, when.

Where a party gives a reason for his conduct and decision touching anything involved in controversy, he is estopped, after litigation is begun, from changing his ground, and putting his conduct on another and different ground. (*Post, p.* 265.)

Cases cited and approved: Ault v. Dustin, 100 Tenn., 366; Railroad v. McCarthy, 96 U. S., 258.

5. **INSURANCE.** Evidence stated and held to show that death was not caused by the use of drugs and liquors.

In an action on a benefit certificate, void where the death of the member was caused by the excessive use of certain drugs and intoxicating liquors, the evidence is stated and held to show that the death of the member was not caused by the use of such drugs and liquors. (*Post, pp.* 254, 255, 257, 258, 266-268.)

6. **CONSTITUTIONAL LAW.** Statute imposing penalty for failure to pay insurance losses does not impair obligation of contract.

The statute (Acts 1901, ch. 141), imposing a penalty or additional liability of twenty-five per cent upon insurance companies for the failure to pay insurance losses, is not void as impairing the obligation of the contract of insurance. (*Post, p.* 268.)

Acts cited and construed: Acts 1901, ch. 141.

Constitution construed, though not cited: Art. 1, sec. 20.

---

FROM HAMILTON.

---

Appeal from the Chancery Court of Hamilton County. T. M. McCONNELL, Chancellor.

PRITCHARD & SIZER, for complainant.

D. L. SNODGRASS and T. C. LATIMORE, for defendant.

MR. CHIEF JUSTICE BEARD delivered the opinion of the Court.

The defendant is a corporation duly organized under the laws of the State of Pennsylvania, with its principal office in the city of Philadelphia, in that State, and with subordinate lodges, or agencies, located in different States of the Union. The corporation is social and benevolent in character; its object, as indicated in its charter, being "to unite fraternally white persons of proper age and good social and moral character . . . for beneficial and protective purposes, collecting dues and assessments from its members, to provide for the payment to its members, or their families, widows, heirs, blood relatives, or other dependents, benefits in case of sickness, disability, or death of its members, in compliance with its constitution, laws, and regulations."

On the 23d of November, 1887, the corporation issued to Charles C. Snyder, a resident of Chattanooga, and a member of one of its lodges, a benefit fund certificate, or policy, by which it bound itself, on certain conditions therein set forth, at the death of the assured, upon the proof thereof, to pay to the present complainant, at that time and for many years thereafter his wife, or,

in case of her death prior thereto, to his children, a sum not exceeding $3,000.

On or about the 1st of May, 1908, Chas. C. Snyder, died, in Brooklyn, N. Y., where he was then domiciled, and soon thereafter proofs of loss were furnished by complainant to the defendant, and payment of the certificate was demanded by her. This demand being refused, the present bill was filed.

The defenses to this claim, set up in the answer, are:

First. That it had been determined by the supreme medical examiner of the defendant corporation, whose determination of the question, under the laws of the association, was final, that "the health of the assured had become impaired and his death was caused directly or indirectly by the use of narcotics," and the assured had stipulated in the application, on the faith of which the certificate was issued, that in such case the defendant should "not be responsible under the contract."

Second. That the complainant had been divorced from the assured prior to his death, and by the express terms "of the constitution and laws of the order" was *ipso facto* excluded from all further interest in this certificate.

The record shows that, many years after the issuance of the certificate in question, the complainant obtained a divorce from the assured, and was given the custody and control of the children born of their marriage, and afterwards, to wit, on the 25th of June, 1904,

Snyder v. Mystic Circle.

that she wrote defendant a letter, in which she advised defendant of this divorce, and that for ten years prior thereto she had paid the assessments on this certificate, and making inquiry as to whom the money provided for therein, in the event the assessments were kept up, would be paid on the death of the assured. To this letter, under date of June 28, 1904, F. H. Duckwitch, the supreme mystic ruler—the highest officer of the association, and in charge of its affairs as such—made a reply to the complainant, in which he said, in substance, that under the laws of the order Charles C. Snyder, being a member, had "the absolute right" to change the beneficiary, within certain limitations; that "as the certificate now stands" it would be payable, on his death, to the complainant, "provided, of course, that the assessments were paid up," and in case of complainant's death "to his children." This letter concludes with the following paragraph: "I assume, from what you write, that you are in possession of this certificate. If so, it might be difficult for him to secure a new certificate, unless he should take the position that the old certificate *was lost, and he would make affidavit to* that effect, which, under our law, would entitle him to a new certificate."

To this letter the complainant replied, under date of August 18, 1904. In this reply she stated as follows: "I have the certificate in my possession, and intend to keep it. If any one tries to change the beneficiary, saying that the affidavit is lost, or destroyed,

be kind enough to communicate with me before you take any action in the matter. . . ." In response to this letter the supreme mystic ruler wrote complainant that he would file her letter with the petition for membership, in order that the clerks of the association might be advised of her request "to be notified of any application for change of beneficiary."

Following this correspondence, and relying on the statements of the chief officer of the corporation as to her rights in the premises, complainant, as shown by her, with much sacrifice, continued to pay all assessments, or dues, on this certificate up to the death of her former husband, on the 1st of May, 1908.

As has been stated, proofs of loss were promptly submitted by the complainant soon thereafter. In these, in answer to the question as to the cause and manner of his death, she stated it was due to suicide by "inhalation of illuminating gas." In response to a request to state the habits of the deceased "with reference to the use of spirituous or fermented liquors," she replied, "He did drink prior to leaving Chattanooga," and in answer to the question, "Did the deceased use morphine, opium, chloral, or other drugs or narcotics?" she said, "I think he used morphine."

On receipt of these proofs the supreme recorder of the defendant corporation wrote complainant, informing her that her claim was "not on its face a valid one," and that in accordance with the constitution and laws of the order an opportunity was given her to ap-

Snyder v. Mystic Circle.

pear before the supreme executive committee and present such evidence as she might have to establish its validity.  In this letter there was set out a copy of resolutions passed by that committee, in which were recited provisions of the laws of the order to the effect that no benefit should be paid on account of the death of any member when his health had become impaired, or death had resulted, directly or indirectly, from the use of opiates, or alcoholic, vinous, or malt liquors, or when, at the time of his death, the member shall be addicted to the excessive use of alcoholic, vinous, or malt liquor.  It was then stated in one of the resolutions that "from the proofs of death presented it appears that Charles C. Snyder was at the time of his death addicted to the excessive use of narcotics, or alcoholic, vinous, or malt liquors, on which account the claim presented by his beneficiary should not be approved." The resolutions then provided that the complainant "shall appear in person, or by attorney, or both, before the supreme executive committee at the office of the defendant in Philadelphia, Pa., on Friday, July 17, 1908, . . . and offer further proof in support of her claim as she may deem necessary or advisable."

In answer to this letter Mrs. Snyder wrote the supreme recorder that if Mr. Snyder's health had become impaired by the use of liquor, or if he was accustomed to use of narcotics, she did not know it, and did not intend so to state in the proofs of death; that Snyder had been away from Chattanooga for a number of years,

and she had no personal knowledge of his personal habits, but when she saw him last he showed no evidence that he used narcotics, or that his health had become impaired by the use of intoxicating liquors. She stated, further, that it was impossible for her to appear in Philadelphia, either in person or by attorney, on July 17th, but that she would send such statements as she could before that date, and requested that a copy of the proofs she had furnished be sent her.

In answer to this letter the supreme mystic ruler wrote complainant: "We are unable to furnish you a copy of the proofs of death, as they are on file with the supreme medical director, at Columbus." He stated that: "Upon investigation we found that Mr. Snyder was a morphine and cocaine fiend, and that after his death many vials, labeled 'Cocaine,' 'Morphine,' and 'Chloroform,' were found in his rooms. We also ascertain that he used alcoholic liquors to excess, and that he had been a heavy drinker for more than fifteen years before he went to Brooklyn, N. Y. Further, that he was again married in Brooklyn, in July, 1904, and that the widow, his last wife, is living." He then calls complainant's attention to the agreements in the "Application for Beneficial Membership" made by Snyder, to the effect that "if his health should become impaired, or if he should die from the excessive use of" liquors, narcotics, etc., the defendant would not be liable on the certificate, and stated that complainant might submit

such proofs as she was able to secure tending to establish the justness of her claim, by affidavits or other documentary evidence, and suggested that she also furnish a certified copy of her decree of divorce from Charles C. Snyder. In conclusion, the letter states that "any proof that you may submit will receive careful consideration by the supreme executive committee."

Soon after this, and in obedience to the suggestion made, the complainant secured and sent to the defendant, at its office in Philadelphia, the affidavits of twenty-one different persons, who claimed to have known the deceased intimately during a portion of, or all, the years that he lived in Brooklyn, and who stated that during their acquaintance with him his habits were temperate in the use of intoxicating liquors, and that from their associations with him and to the best of their knowledge he did not use narcotics. In addition, she submitted her own affidavit, in which, among other things, she states that she had not seen or talked with Snyder, or had any correspondence with him, from the time she obtained her divorce, in June, 1901, up to the date of his death, in May, 1908, and that she knew nothing about his habits during that period; that he never drank nor used narcotics to such an extent as to impair his health during the time she knew him, and if he used either after the separation she did not know it; and that she did not intend, by anything she said in the proofs of loss, to indicate that she knew what his habits were. She also set out in detail the information

122 Tenn—17

that she had as to the circumstances attending his death, from which she drew the conclusion, as she says, that the assured committed suicide because of his financial troubles and disappointments over the failure of his eldest son to go to New York and live with him.

On August 10, 1908, the supreme recorder wrote complainant that her claim "as the alleged beneficiary" under the certificate in question had been rejected by the supreme executive committee "as not being a valid one under the constitution and laws of the order and contract of membership;" and on the day following the general counsel wrote complainant at length, explaining the action which had been taken. He stated that the supreme executive committee, "after careful consideration of all the proofs presented, decided that the defendant was not liable on the certificate," for the reason "that said member's [Charles C. Snyder's] death was due solely and wholly to the excessive use of morphine and other opiates." He then referred to the correspondence which had taken place between himself as supreme mystic ruler and complainant, in June, 1904, already referred to, and stated, in substance, that under the laws of the order no divorced wife could be a beneficiary, and that, therefore, she could not be a beneficiary under the certificate in question, even if the claim had been a valid one.

Leaving out of view, for the time being, other matters for consideration, the first question presented is: Is the complainant, as the divorced wife of Charles C.

Snyder, entitled to recover on this certificate?   It is insisted by the defendant that she is not; and to sustain this insistence the charter, the constitution and by-laws of the order, and certain authorities, are invoked.

That the complainant was rightfully a beneficiary at the time of the issuance of this certificate, and continued to be such at the date of her divorce, is beyond question.   After the divorce was obtained, the beneficiary was not changed by the assured, as he had the right to do under the laws of the order, and the defendant corporation continued the certificate in her name, and with the full knowledge of the divorce she was encouraged by its chief executive officer to believe that, in the event of the death of the assured without change, if dues and assessments were paid by her, she would be entitled to receive the money provided for in the certificate upon proper proofs of loss.   Accepting the assurance of the supreme officer of the corporation to be made in good faith, she continued to pay these dues and assessments up to the death of Charles C. Snyder. Certainly, on these facts, there is a strong equity in her favor, which the defendant should not be permitted to repel, unless it can interpose some legal objection which a court is without power to disregard.

It will be observed, in reading that portion of the charter which affects this question, hereinbefore set out, that only in general terms is the "object" of the corporation set out; that is, the collection of dues and assessments "from its members to provide for the pay-

ment due its members, or their families, widows, heirs, or other dependents, benefits," in case of "sickness, disability, or death."

It may be conceded that, if the charter had in express terms restricted the application of the benefit fund to the class named, or, in other words, had affirmatively provided that it should be appropriated to none others, then it might be argued that payment to complainant upon her personal claim as the divorced wife of the assured could not be enforced. In such a case we can well understand that a recognition of the claim of the divorced wife by the superior officer of the order, followed by the receipt of assessments by it, would not avail to repel the defense of *ultra vires*. The authorities largely relied upon by the defendant corporation announce and enforce this principle.

But there are no restrictive words in this charter. At the time of the issuance of the certificate to Charles C. Snyder the complainant was his wife, and as such had an insurable interest in his life. The defendant issued the certificate, payable to her as such wife, as unquestionably it had the power to do. Its charter made no provision for a forfeiture of her right as beneficiary in the event of her divorce from the assured. No demand was made by the defendant for a surrender of this certificate on account of the changed relations of the beneficiary to the assured, and no alteration was made in it, and no intimation ever given to her that she had, after her divorce, no claim on the order. To the

contrary, in recognition of an existing interest, with full knowledge that she no longer sustained the relation of wife, its supreme mystic ruler induced her to continue the payment of dues and assessments on this certificate, at the expense of much personal sacrifice, and the defendant received and appropriated the sums so paid for a term of years, and until the death of the assured. Certainly, we repeat, if there is any sound ground for an equitable estoppel upon which this claim can be rested then it should be found, and complainant given relief.

It is true that some authorities can be found which hold, with the contention of the defendant, that in the face of even such general terms, lacking words of limitation or description, as are to be found in this charter, it would be an unauthorized diversion of a trust fund to award the money, represented by this certificate, to the complainant. The courts in which this class of cases are found have adopted a rigid rule of construction. 1 Bacon on Benefit Societies, secs. 243-245. On the other hand, other courts have adopted a "more liberal view," and, as we think, altogether a more reasonable one, and with these this court, as is said in *Manley* v. *Manley*, 107 Tenn., 191, 64 S. W., 8, has ranged itself.

That case involved a controversy between the surviving mother of a deceased member of an order, known as the "Brotherhood of Locomotive Firemen," and his widow and children, as to a fund represented by a cer-

tificate issued to the member and payable to his mother. It was there insisted by the widow, for herself and children, that the fund from which the claim in question was paid was "established to provide substantial relief to members and their families, in the event of death or total disability," and that the mother of the deceased was not within the classes provided for. The provision just quoted constitutes a part of section 47 of the constitution of that order.

In reply to this insistence it was said by the court: "It will be observed that there are no restrictive words in section 47. The terms used are general, and declare the purpose for which this beneficiary department is established, without fixing or undertaking to fix beyond recall a class to which, in case of death of a member, the money provided for must of necessity go. While the clear implication is that the fund raised is for the "substantial relief of members and their families, in the event of death or total disability," yet there are no words depriving the member of the right to designate any member of his family he may see proper as a beneficiary, or which gives one member of his family a fixed right superior to that of another." It was held that the mother was entitled to the benefit of that fund.

Among the cases referred to as supporting the conclusion of the court is that of *Maneely* v. *Knights of Birmingham,* 115 Pa., 305, 9 Atl., 41, in which the same liberal construction was given to a charter clause of one of these beneficial associations, which stated

Snyder v. Mystic Circle.

that the purpose of the corporation was the maintenance of a society to benefit "the widows and orphans of deceased members." A person other than a widow or orphan of a deceased member, to whom a certificate has been issued, when demanding payment, was met by a defense that the contract was *ultra vires,* and it was so held by the lower court. In reversing this judgment it was said: "We think this is too narrow and strained a view to take of this section of the charter. While it is true that the general purpose of the corporation is there stated, . . . it must be observed that this is only the statement of a general purpose. . . . There is no prohibitory or restrictive language excluding from the powers of the corporation the right to contract specially with the member for the payment of benefits to other persons than his widow or orphans." Supporting this view are to be found many cases. Among these may be cited *Lane* v. *Lane,* 99 Tenn., 639, 42 S. W., 1058; *Alfsen* v. *Crouch,* 115 Tenn., 352, 89 S. W., 329; *White* v. *Brotherhood of American Yeomen* (1904), 124 Iowa, 293, 99 N. W., 1071, 66 L. R. A., 164, 104 Am. St. Rep., 323; *Sheehan* v. *Journeymen,* 142 Cal., 489, 76 Pac., 238; *Benefit Society* v. *Blue,* 120 Ill., 121, 11 N. E., 331, 60 Am. Rep., 558; *Lindsey* v. *Western Mutual Aid Society,* 84 Iowa, 734, 50 N. W., 29; *Story* v. *Williamsburg, etc., Mutual Benefit Asso.,* 95 N. Y., 474.

It is urged, however, that one of the laws adopted by the defendant, and in existence at the time of the issuance of the certificate to C. S. Snyder, provided that

"if at the time of the death of a member, who has designated as his beneficiary a person of class second [in the present case the wife], the dependency required by the laws of the order shall have ceased. . . . or if the designated beneficiary is a husband or wife, and they should be divorced upon the application of either party, . . . then the benefits shall be payable to person, or persons, mentioned in class first (section 11, law 1), if living, . . ." and that this provision necessarily defeats the claim of complainant. We think the answer to this contention is that the order which made this law could waive it, and that by the receipt of assessments and dues by the defendant after the divorce, and with full knowledge of that fact, it was waived. It is true that Mr. Duckwitch, the supreme mystic ruler, states that in a moment of forgetfulness as to this provision he wrote the letter to the complainant of date June, 1904, hereinbefore referred to. We grant that he was not able, by virtue of his position as chief executive of this order, either by direction or indirection, to set aside or suspend the operation of one of its laws. But this is not the point. His knowledge of the divorce secured by the complainant was that of the association, and its receipt of assessments and dues thereafter constituted the waiver in law insisted upon.

There is another ground, however, which we regard as conclusive on this point as against the defendant. It will be seen, from the statement hereinbefore made,

that the representatives of the order did not decline to pay this claim because of the divorce of the complainant from Chas. C. Snyder, the assured, but on the other and distinct ground that his "death was due solely and wholly to the excessive use of narcotics, alcoholic, vinous, and malt liquors, and the excessive use of morphine and other opiates." Having taken this ground with knowledge of this provision in its laws, and of the fact of the divorce, it is now estopped to assert this latter fact as being a forfeiture of complainant's interest in this certificate. 3 Cooley's Insurance Briefs, p. 2680; *Insurance Company* v. *Thornton*, 97 Tenn., 1, 40 S. W., 136; *Insurance Co.* v. *Hancock*, 106 Tenn., 513, 62 S. W., 145, 52 L. R. A., 665; *Smith* v. *German Insurance Company*, 107 Mich., 270, 65 N. W., 236, 30 L. R. A., 368; *McCormick* v. *Insurance Co.*, 163 Pa., 184, 29 Atl., 747.

This is but the application to insurance cases of the well-established rule "that, when a party gives a reason for his conduct and decision touching anything involved in the controversy, he is estopped, after litigation is begun, from changing his ground, and putting his conduct on another and different consideration." *Ault* v. *Dustin*, 100 Tenn., 366, 45 S. W., 981; *Railway Co.* v. *McCarthy*, 96 U. S., 258, 24 L. Ed., 693.

This rule equally disposes of the contention that the determination of the medical director of the defendant against this claim was conclusive on the complainant, and also as to the effect under the by-laws of the failure of the complainant to appeal from the decision of the executive committee to the general counsel.

Independent, however, of the views above expressed, we think that the present suit could be maintained by the complainant in her own name, having the legal title by virtue of this certificate in question to the fund provided for in it, and that, under section 14, her recovery would inure to the benefit of her children. It is not necessary, however, in order to save this claim in favor of complainant, that this ground should be taken, as we are satisfied that the views already presented are sound, and that she is entitled in her own right to this recovery.

This leaves open only the question as to whether the death of the assured was due to the excessive use of narcotics, and of vinous and malt liquors. That his death was the result of suicide, produced by the inhalation of illuminating gas, is beyond controversy. It is not insisted, however, that the death thus caused was within the inhibition of the policy. The laws of the order prevented the interposition of the defense of suicide, where a member had continued in good standing for a period of ten years or more, as was the case of the deceased.

An examination of the record shows that the overwhelming weight of the testimony, coming from witnesses who knew the deceased intimately for fifteen or twenty years, and some of them up to the time of his death, is that he was a moderate drinker, and was not addicted to the use of narcotics in any form. His death, on this record, can be attributed to the fact that the deceased had become desperate from financial straits, and on account of his conduct, whatever it may have been,

which had separated from him the present complainant and their four children, and the consciousness of the utter waste of what might otherwise have been possibly, a brilliant life. The statement of the complaint, in the proofs of loss, with regard to his drinking and to the use of morphine, were honestly made by her. She had not seen him for about fourteen years before the making of these proofs. While they lived together as man and wife, as is shown, he did drink moderately, and, knowing this, she answered as to the habits of the deceased as to the use of spirituous or fermented liquors, that "he did drink prior to leaving Chattanooga." In response to the question as to whether he used morphine, etc., she made reply, as has been seen, "I think he used morphine." This last answer is explained by her in an affidavit submitted to the defendant, when seeking a settlement of her claim, and before the institution of the present suit, as well as in her deposition, by the statement that prior to their separation, while in the city of Chicago, upon one occasion she found a white substance in the room occupied by herself and her then husband, and, apprehensive that it might be a narcotic, she sent it by one of their children to a druggist for his opinion, and the child came back and reported that it was morphine, and that this was the incident that she had in her mind at the time she made this particular answer. She stated, further, that she knew nothing since their separation of the habits of the deceased.

We regard this explanation as entirely satisfactory,

and consistent with good faith in pressing the present claim.

The chancellor not only gave the complainant a decree for the amount of the certificate and interest, but allowed her in addition thereto, 25 per cent. thereon, under chapter 141, p. 248, Acts of 1901. It is insisted that this act, in imposing this additional liability on the defendant, is void, in that it impaired the obligation of the contract in question. This question has been presented and determined against this insistence in both published and unpublished opinions. We are entirely satisfied with the holding heretofore made. In all respects the decree of the chancellor is affirmed.