# BEGOVICH v. KRULJAC, ET AL.
## (No. 1444; May 15, 1928; 267 Pac. 426)

*Fred W. Johnson,* for plaintiff in error; *Lewis H. Brown,* of counsel.

W. A. *Muir*, for defendants in error.

BLUME, Chief Justice.

It appears that the decedent, Mike Begovich, was engaged as an equal partner in the butcher business at Rock Springs, Wyoming, with one Kruljac, the partner-

ship having $16,000 in accounts outstanding on the books at the time hereinafter mentioned. Decedent was a bachelor and apparently left surviving him, as his only relatives, two brothers, Marko, who is the administrator of his estate, and Migo, who is a resident of Dalmatia. For the period of about nine years prior to his death decedent had lived and boarded with Mrs. Carrie Chockie, who had two children, Mary and Lizzie, nine and five years old respectively, these children being the respondents in this case, Carrie Chockie, the mother of the children, appearing for the minors here and in the court below as guardian *ad litem* pursuant to an appointment made by the trial court. About a month before decedent's death he had a conversation with his partner Kruljac, in which he intimated to the latter that he would put some additional capital into the business "for the benefit of these children," meaning the minors above mentioned. On June 11, 1922, and for some time prior thereto, decedent was a sick man, suffering with cancer or ulcers of the stomach, and on the date last mentioned prepared to go to Soda Springs, Idaho, for an operation, so he called Kruljac to the house, who, on that point, testified on January 9, 1924, as follows:

"A. On the 11th day of July, 1922, I had a call from Mike Begovich to come in the house where he was living.

Q. You had a call for you to come to the house?

A. Yes, and when I come in the house he gave me two thousand dollars and said 'Keep this money in the safe.' And I took it down with me in shop and in same day we was prepared to go to Soda Springs and he told me in afternoon, like this, he said, 'Joe, this two thousand dollars you could put in the business and you could use the benefit from this money for those two children,' and then we went down this same night to Soda Springs.

Q. For what purpose did you go to Soda Springs? What was this trip in connection with?

A. Well, he had to take operation on the stomach, and he say 'If anything happen to me use those money for the

benefit of those children,' but he told me, 'Don't put this money in bank, 'cause then I come back and I take it back because all this money is gold certificates and I want those money back.'

Q. Prior to the time you left for Soda Springs he gave you this two thousand dollars?

A. Yes, sir.

Q. And told you to put it in the business and if anything happened to him to use that for two certain children?

A. Yes.''

The same witness again testified on this matter on July 11, 1925, again stating that decedent had told him ''to use the money for benefit of children,'' and ''put this money in the business and the interest or dividend from this money to use for the benefit of these children,'' meaning the minors above mentioned. He added considerable to his former testimony, however, testifying that the decedent asked him on July 11, 1922, to make a will for the decedent; that he drew it, whereby the decedent gave $200 to a child of the witness, $500 to Lizzie Chockie, and the remainder of his property to his two brothers; that the will, however, was not signed by the decedent but only by two witnesses. He did not explain when the latter signed the instrument. He further testified that the decedent later, at Soda Springs, told him not to put the money in the bank because ''I want this money when I come home'' and ''he say 'If I die you take the will I make in Wyoming Market and go according to that.' '' He admitted, however, that a few days after decedent's death, which occurred on June 15, 1922, as a result of the operation contemplated a few days prior to that time, as above stated, he told Mr. Muir that he received the two thousand dollars for the benefit of the two minors. The only other witness in the case was Carrie Chockie, mother of the minors. She testified that she was present at the time when the decedent gave $2000 to Kruljac. The substantial part of her testimony is as follows:

"A. Mike Begovich open trunk and take money and give to Kruljac to count it. When he count it he says he count two thousand dollars and Mike told him, and he says, 'Joe, take this two thousand dollars and keep it for Mrs. John Chockie's two children, Mary and Lizzie, and if make it some money you can use it for business,' and Kruljac don't put money in business because he know it belongs to children. He won't touch that money for business.

Q. You heard Mike Begovich say this?

A. Yes, I did.

Q. Did Mike Begovich tell you anything about giving your children any money before Kruljac came to the house?

A. No, I never heard it before.

Q. That same day?

A. Yes, he told me he was going to give me money for my children.

Q. Before Kruljac came?

A. Yes.

Q. Did he tell you what children?

A. He meant my Mary and Lizzie."

The court, under the foregoing testimony, held that the decedent made a gift *causa mortis* on July 11, 1922, of $2000 for the benefit of the children hereinbefore mentioned, Mary and Lizzie Chockie. From the judgment so entered, the administrator of the estate of Mike Begovich has appealed.

1. The administrator objected to the admission of the testimony of Carrie Chockie on the ground that she was a party to the action and therefore was forbidden to testify under the provisions of Section 5807, Wyo. Comp. Stat. 1920. The court, however, admitted the testimony and this is assigned as a ground of error herein. We think that the court was right. While there is some difference of opinion on the question, the weight of authority clearly is that a guardian *ad litem* is not a party to the action but is simply the representative of the court and is more in the nature of an attorney than a party to the action, and that such person is not prohibited from giving testimony

in a case by reason of being a party to the action. Had Mrs. Chockie resigned as guardian *ad litem* prior to the time she gave her testimony, she would have been clearly competent as a witness. The fact that she did not do so but carried out the order of the court in representing these ·minors should not disqualify her as a witness. Note, 4 A. & E. Ann. Cas. 1068; Bryant v. Livermore, 20 Minn. 313, 342; Trahern v. Colburn, 63 Md. 99, 103; In re Hebb's Estate, (Wash.) 235 Pac. 974.

2. It is contended that there is no evidence to establish a valid gift *causa mortis*. It was said in Hecht v. Shaffer, 15 Wyo. 34, 41, 85 Pac. 1056, that in order to constitute such gift, there must be a clear and manifest intention of the donor to give, a subject capable of passing by delivery, and an actual delivery at the time, in contemplation of death. We need not pause to consider the first two of these requisites above mentioned. The subject of the gift in the case at bar was capable of passing by delivery. Further, the court was, we think, fully warranted in finding that the intention to give was clear and manifest. The decedent had for nine years lived and boarded with Mrs. Chockie; a month previous to going to Idaho, he showed his desire to do something for the children. The statements made to Kruljac and to Mrs. Chockie on June 11, 1922, evinced the same desire, and these facts were sufficient, we think, to authorize the court to conclude that the intent to give was clear. The point that has given rise to the greatest controversy in connection with gifts of this nature has been the subject of delivery, which in the case at bar is complicated by the fact that it was made to a third person instead of the donees themselves. There is a disagreement among the courts, and the same or almost the same state of facts has led some courts to one conclusion, and other courts to an opposite conclusion. We shall attempt to discover where the trouble is. The Roman law to which counsel

for appellant have directed our attention does not shed a great deal of light upon the subject, although it is true that our rules on gifts of that character were largely derived from that law. Ward v. Turner, 2 Ves. Sr. 431; Tate v. Hilbert, 2 Ves. Jr. 111. See Bracton and his relation to the Roman Law, by Guterbock, Translation by Coxe. Counsel for appellant wants us to remember that Justinian required five witnesses for the validity of such gifts (C. 8, 56, 4), and he points to that as showing the strictness of the Roman law in regard thereto. The requirement sounds strict to us in the light of modern business methods, but it was not so in the light of the requirements in business transactions in Justinian's time. That emperor favored gifts. Prior to his time delivery had been required. He dispensed therewith, and permitted, probably as an alternative, (Buckland, Roman Law, 257), the execution of such gifts in the presence of five witnesses, and adopted the particular method because he likened gifts *causa mortis* to legacies, and these might be given by an informal will, as opposed to the formal will, the latter requiring, among other formalities, the presence of seven witnesses. He even went so far as to dispense with all delivery in case of gifts *inter vivos*, making a promise to make a gift binding, though resting upon no consideration whatever. Inst., 2, 7, 2. So that in truth and in fact, the latest expression of the Roman Law, as it has come down to us, favored gifts of this nature, rather than the contrary. Bracton did not adopt Justinian's law, because inconsistent with the feudal spirit, and rather returned to the earlier rule, requiring delivery both in the case of gifts between the living and gifts in anticipation of death. But the character and nature of such delivery, particularly of gifts *causa mortis*, has been the subject of discussion ever since, as it was a fruitful source of discussion among the Roman lawyers. Inst., 2, 7, 1.

It is frequently said that a gift *causa mortis* partakes of a legacy in that it is not fully effective until after the death of the donor, and that it partakes of a gift *inter vivos* in that it must be delivered during the lifetime of of the decedent. The intention to give must be clear in either case. In gifts *inter vivos* the primary intent and purpose is to give immediate control of and dominion over the property to the donee. The intent to give is not sufficient. It must be fully and completely carried out. The transaction lacking consideration, the intent or promise to give cannot be enforced against the donor or his heirs. No gift is made, unless it was perfected by actual delivery, fully and completely giving dominion over, and control of, the subject of the gift during the donor's lifetime to the donee. Flanders v. Blandy, 45 O. S. 108, 12 N. E. 321. In other words, delivery is just as much a constituent element of such gift as the intention to give. Cochrane v. Moore, 25 Q. B. Div. (1890) 57. A legacy, on the other hand, passes into the enjoyment of the beneficiary of the gift only upon the death of the giver. A testament must be evidenced in the manner specified by the local statutes. This requirement is not made for the purpose of discouraging such gifts. On the contrary, it has been recognized as sound public policy ever since the dawn of Aryan civilization, to permit men to dispose of their property during their life time and give it, after their death, to such person as they may deem fit, subject to certain exceptions which vary and have varied among the different nations and states, and which need not be detailed here. The requirement as to the method of executing a testament is primarily to protect a decedent, and others, against fraud, and to make certain that the intentions and wishes of the decedent are carried out. Except for these facts, the state would not be particularly interested to know whether a decedent executes his will in writing or without writing, and whether in the presence of one or more wit-

nesses or none. Now a gift *causa mortis*, too, cannot come into the enjoyment of the donee till after the death of the donor. It is in that respect exactly like a testamentary bequest. The requirement as to delivery of the gift, accordingly, cannot be for the purpose of transferring possession and enjoyment, but in the nature of things cannot be for any other purpose than is subserved by the execution of a testament in the manner required by law, namely, to prevent fraud and make the intentions and wishes of the donor certain and definite. Hence while in gifts *inter vivos* delivery is one of the constituent elements thereof, it subserves but the purposes of evidence in gifts *causa mortis.* See 59 Pa. Law Rev. 98; Drew v. Hagerty, 81 Me. 231, 17 Atl. 63, 3 L. R. A. 230. In the former case, it is one of the ends in view; in the latter it is but a means to an end. The distinction is important, and the failure to bear it in mind is, perhaps, accountable for the disagreement among some of the cases on the subject. Furthermore, gifts *causa mortis* are ordinarily resorted to by intending donors because the facilities for executing the more formal testamentary disposition are not available, or the death of the donor is so imminent in point of time as to preclude preparation of the formal documents. They are in their very nature emergency measures. Hence, though delivery cannot be dispensed with, since words may be easily misrepresented (Drew v. Hagerty, supra), still we should naturally expect the courts to hold the requirements as to such delivery to be less strict than in connection with gifts *inter vivos,* and that, in fact, is the holding of at least many of the courts. Meach v. Meach, 24 Vt. 591; Murphy v. Bordwell, 83 Minn. 54, 85 N. W. 915, 52 L. R. A. 849, 85 Am. St. Rep. 454; Scott v. Bank & Trust Company, 122 Tenn. 258, 130 S. W. 757; Devol v. Dye, 123 Ind. 321, 24 N. E. 246, 7 L. R. A. 439; In re White's Estate, 129 Wash. 554, 225 Pac. 415; Innes v. Potter, 130 Minn. 320, 153 N. W. 604, 3 A. L. R. 896; Sharpe v. Sharpe, 105 S. C. 459, 90 S. E.

34, 3 A. L. R. 891; Pyle v. East, 173 Ia. 165, 155 N. W. 283, 3 A. L. R. 885; Eason v. Blood, (Ia.) 208 N. W. 508, 44 A. L. R. 1516. Thus in Murphy v. Bordwell, supra, the court among other things said:

"While it is true that a promise or intention to make a gift in the future without act to effectuate will not constitute a donation, yet any substantial act upon the part of the owner of the property, tending to carry the gift into effect and give the donee dominion over the property, so she can appropriate it to her use, will in the absence of fraud, support such gift."

And in Scott v. Bank and Trust Company, supra, which examines a great many cases, the court among other things said:

"An examination of the modern cases all show, while courts will scrutinize with care the evidence upon which gifts *causa mortis* are sought to be sustained, and will require in every case clear and convincing proof, yet, when it is once ascertained that it is the intention of the donor to make such a gift, and all is done which it is possible under the circumstances in the matter of delivery, the gift will be sustained."

In the case of Devol v. Dye, supra, the court said:

"The intention of the donor in peril of death, when clearly ascertained and fairly consummated within the meaning of well established rules, is not to be thwarted by a narrow and illiberal construction of what may have been intended for and deemed by him a sufficient delivery. The rule which requires delivery of the subject of the gift is not to be enforced arbitrarily."

While, accordingly, the requirements of delivery are not so strict in gifts *causa mortis* as in gifts *inter vivos*, and while, on the other hand, the requirements necessary to make a testament need not be complied with, it does not follow that gifts *causa mortis* can be made more easily

than the other gifts, for an additional, compensating, requirement becomes necessary in connection with the former, not found in connection with the latter, and that is the showing that the gift was made in contemplation of death, so as to lend credibility to the making of the gift. 28 C. J. 698. It is not necessary, however, that the donor is in *extremis* and certain of speedy death. Such gift may be made by one apprehensive of death from a present malady, or imminent peril, as from a necessary surgical operation which he intends voluntarily to undergo in hope of relief. Ridden v. Thrall, 125 N. Y. 572, 26 N. E. 627, 11 L. R. A. 684, 21 Am. St. Rep. 758; In re Reh, 196 Mich. 210, 162 N. W. 978. The danger that might otherwise arise from permitting such gifts is further limited by the fact that, according to most of the cases, at least, they apply only to personal property. 28 C. J. 696.

It is not essential that the delivery be made to the donee himself. If it is made to a third person with direction that the subject of the gift be turned over to the donee after the death of the donor, that is sufficient, notwithstanding the fact that the delivery in such case can, ordinarily or at least frequently, be said to have been as complete as the circumstances allow only in theory and not in fact. The very first case decided under the common law on the subject of such gifts, so far as we know, is Drury v. Smith, 1 Pere Williams 404, 24 Reprint 446, decided in 1717. In that case an uncle gave a bill for 100 pounds to a third person ''to be delivered over to his nephew in case he, the testator, should die of that sickness, which did accordingly happen.'' The gift was upheld. The same rule was early adopted in this country: Wells v. Tucker, 3 Binn. (Pa.) 366 (1811); Coutant v. Schuyler, 1 Paige (N. Y.) 316 (1829); Borneman v. Sidlinger, 15 Me. 429 (1839) 23 Amer. Dec. 626; Kilby v. Goodwin, 2 Del. Chan. 61 (1838); Sessions v. Moseley, 4

Cush. (Mass.) 87 (1849) ; Michener v. Dale, 11 Harris
(Pa.) 59 (1854). In 1846, however, the case of Cave v.
Cave, 2 Coll. 456, 63 Eng. Reprint 768, announced a rule
which has apparently had considerable influence on some
of the decisions in this country, namely, that if the donor
delivers the property to a third person as his own agent,
instead of as the agent of the donee, there cannot be said
to be any delivery. See also 28 C. J. 695. And the con-
tention made in the case at bar is that Kruljac was the
agent of the decedent and not of the children. The rule
above stated has been discussed in a number of late cases.
Thus it was said in Varley v. Sims, 100 Minn. 331, 111 N.
W. 269, 8 L. R. A. (N. S.) 828, 117 Am. St. Rep. 694, 10
Ann. Cas. 473, that the reason for the rule (though not
applied in that case) "is found in the fact that to give
legal effect to such gift, the present title to the property
must pass to the donee, and it does not pass so long as
the donor or his agent retains possession or control of it.
The agent has no authority to deliver after the donor's
death, for his authority as such ceases when his principal
dies."

The difficulty, however, lies in applying the rule. In a
sense at least every third person who is directed by a
donor to deliver property as a gift to another, after the
death of the giver, must be considered as the agent, or·
trustee, of the donor, for the donor has the right to re-
voke the gift at any time before his death, and if he does
so, it becomes the duty of the third person to return the
property covered thereby. Hence the point must arise in
every case of that kind, how far the agent is the agent of
the donor, and for what length of time. In Noble v. Gar-
den, 146 Cal. 225, 79 Pac. 883, 2 Ann. Cas. 1001, it ap-
pears that one Noble was the secretary of a building and
loan association. Deceased caused him to issue certain
certificates of shares in that association to her. That was
done. The certificates were taken to her. At her request,

Noble made an assignment thereof to various individuals. The decedent kept the certificates a few days, again sent for Noble and told him to keep the certificates in his safe and if anything happened to her to deliver them to the assignees. The court held that Noble was the agent of the decedent and that no delivery had taken place. In re White's Estate, 129 Wash. 554, 225 Pac. 415, may be used as an illustration of a contrary holding. In that case, one of the gifts, upheld by the court, was manifested in a writing signed by decedent, addressed to a friend of a decedent, a Mrs. McVicar, and read as follows:

"In case of my death I authorize you to cash both mortgages with F. M. Jordan & Co., and send to sister Annie Marshall, Uly, Michigan. In both cases if dead to go to their children."

A note was appended, signed by the decedent, introducing Mrs. McVicar as one "who will transact all business with F. M. Jordan & Co." The court upheld the writing as a gift to Annie Marshall, and said in part:

"Many years ago the rule of law in this respect was exceedingly strict and harsh, but it has now been softened so that only such delivery is required as the nature of the thing given and the circumstances under which it is given will permit, and so it is very generally held that the thing given may be delivered direct to the donee, or to some designated person for him, and the delivery may be either actual, constructive, or symbolical."

In Wells v. Tucker, supra, a delivery to the wife of the decedent, who might well have been considered much more the agent of the decedent, than the secretary of the building and loan association in the California case, was held to be sufficient. That was true also in the case of Grymes v. Hone, 49 N. Y. 17, 10 Am. Rep. 313, where the court held the third person to be the agent of the donor,

but that a delivery to such person was nevertheless sufficient, saying:

"The assignment was delivered to his wife for the donee. She thus became the agent of the donor. So far as the mere delivery is concerned, this is sufficient."

The same thought was in the mind of the court in the case of Sessions v. Moseley, 4 Cush. (Mass.) 87, where the court said:

"If therefore it be delivered to a third person with authority to deliver it to the donee, this depositary, until the authority is executed by an actual delivery to and acceptance by the donee, is the agent of the donor, who may revoke the authority and take back the gift; and therefore if the delivery do not take place in the donor's lifetime, the authority is revoked by his death; the property does not pass but remains in the donor, and goes to his executor and administrator. But if intended as a gift *causa mortis,* it could not become absolute and irrevocable till the death of the donor; and therefore if delivered to and accepted by the donee, after the decease of the donor, it is sufficient."

In the case of Sharpe v. Sharpe, 105 S. C. 459, 90 S. E. 34, 3 A. L. R. 891, the court discusses the point now under consideration, and says:

"The action must be through another unless it be directly with the donee, because the donor acts in view of certain death. It is not likely to be exclusively with the donee, because his ownership is defeasible. And if the transaction be between the donor and the donee in their own persons, even in that case the donee is in some sense the agent of the donor to return the article to the donor in the event he shall survive. But that circumstance would not rob the delivery of its effectiveness. The emergencies of every such case press hard; a dying man, with mind freighted with memories of the past and apprehensions of the future; his friends gathered about the.

scene; no expert to advise what ought to be done to accomplish his intentions. Such a situation calls generally for the intervention of a third party, to hold the stake until the event be determined. We think too much nicety may be exercised in determining whom the third man exactly represents. If it be possible to do so, the law ought to be construed not too logically, but to meet the common transactions of our people in their homes.''

The rule that the gift is valid if the third person is the agent of the donee but not if he is the agent of the donor, may accordingly be of doubtful value, except, perhaps, in cases where the facts of the previous agency clearly indicate that there was no change of possession and no intention of a delivery. To escape this rule, some of the courts hold that the person to whom the delivery is made will be presumed, in the absence of countervailing circumstances, to take the property as the trustee of the intended donee and not as the agent of the donor. 28 Cyc. 694.

It has already been said that in the case at bar the court was justified in finding that the intention to make the gift was clear. The decedent intended to undergo a serious surgical operation and we think that the court was warranted in finding that he was apprehensive of death therefrom. The fact that he delivered the money in controversy to Kruljac is not disputed, and while there is some discrepancy in the testimony, we think the court was justified in finding that such delivery was made substantially simultaneously with the expressed intention that the money should belong to the minor children, to be given them after decedent's death, but to be returned to decedent in case he survived. In view of the fact that the witnesses who testified herein were but little conversant with our language, the trial court was in much better position to determine what they really meant than we are. Even if Kruljac was in some sense the agent of the deceased, we fail to see why that should make any dif-

ference in this case. The statements made by the decedent that he wanted the money back must be construed in the light of the other things that he said. They evidently meant nothing more than that he wanted it back if he should not die, and so construed, they are not at all inconsistent with a gift in anticipation of death. In Callaghan v. Forest, 118 N. Y. S. 541, for instance, the statement made by the decedent was about as follows:

"Here is my purse. Take it. If anything happens to me, I want you to keep it. In case I get well, I want it back." The court held that these words created a gift *causa mortis*. The delivery in this case was, we think, as complete as the circumstances allowed, and we need not even mention the fact that the donees in this case were minors, so that delivery could not well have been to them personally. Other cases, aside from those already cited, which support our holding that a valid gift was made in the case at bar are: Beck v. Hall, (Mo. App.) 211 S. W. 127; Woodburn v. Woodburn, 123 Ill. 608, 14 N. E. 58, 16 N. E. 209, and see numerous cases cited in note to 3 A. L. R. 902-928.

We do not believe that the court was required to find, as is contended, that the gift was revoked by reason of the fact that the decedent told Kruljac at Soda Springs "to go according to the will." The so-called will was never signed by the decedent. The names of witnesses appear thereon, but when or where they signed it, is not shown. So far as appears from the record, the writing was never shown or read over to the decedent. We cannot regard that document of any serious importance herein. The court may not have credited any of the testimony that referred to the will, and we cannot say that it was bound to do so, in view of the fact that Kruljac never mentioned it on the first hearing, and in view of the fact that shortly after he returned from Idaho, after the decedent's death, he stated to Mr. Muir that the $2000 belonged to the child-

ren.  We see no reason to disturb the judgment of the court and it is accordingly affirmed.

*Affirmed.*

KIMBALL and RINER, JJ., concur.