PAULINE LAWRENCE *v.* HARTFORD NATIONAL BANK AND TRUST COMPANY, ADMINISTRATOR (ESTATE OF CHARLOTTE G. LYON)

SUPERIOR COURT      HARTFORD COUNTY      FILE No. 131080

Memorandum filed March 7, 1963

*William B. Collins,* of Manchester, for the plaintiff.

*John E. Larson,* of Essex, for the defendant.

KLAU, J. The substitute complaint and cross complaint seek declaratory judgments determining the ownership of keys to two safe deposit boxes and of two savings bank deposit books alleged by the plaintiff to have been given to her by the defendant's intestate as gifts causa mortis. The parties have stipulated that whoever is determined to be the owner of the keys and deposit books shall be entitled to the contents of the safe deposit boxes and the deposits indicated in the savings bank books.

The two keys are for two safe deposit boxes which were in the name of the decedent at time of her death: (1) safe deposit box No. 340 at the Deep River Savings Bank in Deep River, Connecticut, which when opened by the parties pursuant to Probate Court order was found to contain 319 shares of the common stock of the Great Atlantic and Pacific Tea Company, having a value at the time of the decedent's death of $31.125 per share, $320 in cash and miscellaneous costume jewelry valued at $12; and (2) safe deposit box No. 209 located at the Hartford National Bank and Trust Company,

Old Saybrook Office, Old Saybrook, Connecticut, which, when opened in the same manner, was found to contain miscellaneous correspondence of no significance or value, the pocket watch of the plaintiff's father, who was the decedent's husband, and twelve silver dollars.

The two savings bank passbooks which are in the name of the decedent are (1) passbook No. 11878 of the Deep River Savings Bank in Deep River, Connecticut, which indicates a balance of $4070.40 on deposit in 1960 prior to the decedent's death; and (2) passbook No. 11181 of the Berlin Savings Bank, Kensington Branch, Berlin, Connecticut, which indicates a balance on deposit prior to the decedent's death of $1612.13.

The following facts are found: The plaintiff's mother died in 1914 when the plaintiff, an only child, was ten years old. Her father, William Lyon, in 1916 married the decedent, Charlotte Gladding, a maiden. There was no issue of this marriage. The plaintiff, following her father's marriage, continued to live with him and his second wife until 1922, when the plaintiff married Albert Lawrence.

From the time the plaintiff first began to live with the decedent in 1916 to the time of the death of the decedent on September 19, 1960, there existed an affectionate and continuing mother-daughter relationship between the decedent and the plaintiff. During the later years, the plaintiff lived in Wethersfield, and the decedent and her husband lived in Essex in the home which the decedent owned and which had belonged to her parents. The five children of the plaintiff looked upon the decedent as their grandmother, and she regarded them as her grandchildren. They visited frequently, and the children spent summer vacations with the Lyons. William Lyon, the plaintiff's father and the dece-

dent's husband, died in 1955. He had been employed as a manager by the Great Atlantic and Pacific Tea Company for many years. His estate, which consisted chiefly of the Great Atlantic and Pacific Tea Company stock referred to above, went by will to his widow alone. The proceeds of an insurance policy on his life, of which his widow was the sole beneficiary, were deposited in the savings account of the Deep River Savings Bank referred to above, and except for accumulations of interest represent almost the entire balance now on deposit there.

In the summer of 1959, Mrs. Lyon, the decedent, wrote a note and enclosed it in an envelope. On the outside of the envelope she wrote "Pauline" and in the left-hand corner she wrote, "My last wishes etc." The note was placed in a bureau in her home in Essex and she told the plaintiff where she had put it. The decedent then had also told the plaintiff to get the note and keys, if anything happened to her.

On September 8, 1960, at about 8 a.m., the plaintiff, in Wethersfield, received a telephone call from a neighbor of the decedent in Essex that the plaintiff's "mother" had fallen down, and to come immediately. The decedent, who was seventy-two years of age, lived alone. The plaintiff went immediately to Essex and found the decedent lying on a couch in the den. She was complaining of severe pain in her hip. She had already been seen by a Dr. Saunders, who was covering for her regular physician, and was expecting his return later in the day. Dr. Saunders returned about 3 p.m. and, wishing to x-ray the decedent's hip for a possible fracture, carried her from the house to his car and brought her to his office in Saybrook. Plaintiff accompanied them to the office. X rays were taken. The decedent told the plaintiff that her hip was

broken, that she was being sent by the doctor to the hospital, and that she had selected the Middlesex Hospital in Middletown as she desired to be at a hospital close to the plaintiff so as to be watched by her. The decedent was upset and in pain. An ambulance was summoned to transport her to that hospital. She was placed in it and the plaintiff got in with her. The decedent requested the plaintiff to have the driver stop en route at her house in Essex. The driver was so instructed. When the ambulance stopped, the decedent told the plaintiff to go into the house and get the note above referred to and the keys in the same drawer as well as some personal items of clothing. The plaintiff picked up the note and the keys, which were in a leather case which had formerly belonged to her father, and brought them out to the decedent in the ambulance, which proceeded to Middletown. In the ambulance, the decedent told the plaintiff to take the keys, which were the only ones outstanding for the deposit boxes, and the note home with her, and if anything happened to her, the decedent, the plaintiff was to keep them. The plaintiff understood by these words that if the decedent did not get better— if she died— the plaintiff was to keep the keys. The decedent was placed in bed upon arrival at the hospital.

Plaintiff returned home and later that evening opened the envelope and read the note therein. Written in pencil in the decedent's own hand was the following:

"Pauline

Keys – to D. R. Bank, Saybrook
Htfd – Nat – Bank & Trust,

Burial from Robinson & Wrights [undertaker]

Give this note to undertaker for Paper—"

The note also contained words which had been erased but can still be deciphered as "Born in Essex March 11, 1887." The decedent was in fact born in Essex on March 11, 1888, which may account for the erasure. The erasure was not made by the plaintiff.

The plaintiff visited the hospital for the next two days, September 9 and 10. On September 11, an operation was performed on the decedent and a smith-peterson nail was inserted in her hip. On September 13, the plaintiff went to the hospital. The decedent, who was always referred to as "Mother" by the plaintiff, was in pain and agitated. She asked the plaintiff if she was going to die and told the plaintiff to go to her home in Essex and get her bankbooks, checkbook and various bills and to bring them to her the next day. Plaintiff went to Essex and secured the savings bank passbooks referred to above, the decedent's checkbook, and some bills and returned the next day, September 14, with them. The decedent told the plaintiff to put her checkbook and bills in her pocketbook and to take the bankbooks home with her, the plaintiff, and if anything happened to the decedent to keep them. The plaintiff took the bankbooks home with her that evening. Again, on that day, September 15, the decedent asked the plaintiff if she was going to die. She was very disturbed and worried about her condition because Dr. Sweet, the attending orthopedist, wanted a consultation with another specialist, and the decedent wanted the plaintiff to check with her own personal physician in Essex. Each day, thereafter, except Sunday, September 18, the plaintiff continued to visit her "mother" in the hospital. Each day, the decedent asked if she was going to die. She made out checks for some bills and asked plaintiff to mail them.

On Monday, September 19, plaintiff received a call from a neighbor that "Mother had a shock." Plaintiff went to the hospital and found her "mother" in very poor condition in an oxygen tent. The plaintiff stayed all day. Finally, the doctor sent her home. At 9:30 p.m. she was notified that the decedent had died. The immediate cause of death, as revealed by the death certificate, was acute pulmonary edema and cerebral thrombosis. The interval between onset and death, as set forth in the death certificate, was September 8, 1960, for the pulmonary edema, and September 19, 1960, for the cerebral thrombosis. The condition which gave rise to the above, as given by the certificate, was femoral neck fracture, left. The plaintiff arranged for the burial of the decedent by the undertaker designated by her in the note which she gave to the plaintiff on September 8.

The decedent died intestate, leaving as heirs eight nieces and nephews, children of two deceased brothers, of whom some lived in Middletown, or in its area, and one lived in Florida. The present whereabouts of one is unknown. None of the relatives had ever been as attentive or as close to the decedent as had the plaintiff. Only two of them visited the decedent at the hospital, and none attended the burial at the cemetery. The dwelling in Essex, which was owned by the decedent at the time of her death, was inventoried at a value of about $30,000. The defendant was duly appointed administrator of the estate on November 4, 1960, and has demanded of the plaintiff the return of the keys and the savings bank passbooks. The plaintiff, claiming to be the rightful owner, has refused to return them, and the present action is brought to determine the rights of the parties. The issues are: (A) Was the delivery to the plaintiff of the keys to the safe deposit boxes made on September 8, 1960, a

gift causa mortis? (B) Was the delivery of the savings bank passbooks to the plaintiff on September 15, 1960, a gift causa mortis?

A donatio mortis causa literally means a gift in prospect of death. It is derived from the Roman law and is an innovation upon the law of wills, permitting the disposition of personalty without the formalities of a written will. In a gift causa mortis, there is no intent to pass any interest while the donor lives. Otherwise, we would be concerned with a gift inter vivos. It is ambulatory, incomplete, and revocable during the donor's life. Revocation may be effected by the recovery from his illness or the taking back of possession. It differs from a legacy. The claim need not be proved in a court of probate. Title to the donee becomes by relation complete and absolute from the time of delivery. No consent or other act on the part of the executor or administrator is necessary. It is not contrary to public policy but should be scrutinized with care because of the occasion presented for fraud. *Raymond* v. *Sellick,* 10 Conn. 480, 484; *Brown* v. *Brown,* 18 Conn. 410, 416; *Prendergast* v. *Drew,* 103 Conn. 88, 92.

The principal issue between the parties is whether the plaintiff has sustained her burden of proof with respect to the first essential condition, namely, that at the time the decedent gave the keys to the safe deposit boxes to the plaintiff on September 8, they were given to her by the decedent in contemplation of the conceived approach of her death. In its brief, the defendant concedes that there is evidence that on September 15, when the decedent gave the savings bank passbooks to the plaintiff, they were given by the decedent in contemplation or in imminent apprehension of the approach of death, but the defendant contends that there is no

evidence to support such a conclusion with respect to the delivery of the keys to the plaintiff on September 8.

To constitute a valid gift causa mortis, three conditions are essential: (1) It must be made by the donor in contemplation of the conceived approach of death; the transfer must be made in view of impending dissolution, that is, contemplation of death from present illness or impending peril. 2. It must be given to take effect only in case the donor dies. 3. There must be a delivery of the subject of the donation. See *Raymond* v. *Sellick,* supra; *Brown* v. *Brown,* supra; *Prendergast* v. *Drew,* supra; *Johnson* v. *Colley,* 101 Va. 414; see note, "Gifts Causa Mortis," 99 Am. St. Rep. 890. A vague and general impression that death may occur is not sufficient to constitute a gift causa mortis; to give it the character of a gift causa mortis, death must arise from an impending sickness. *Prendergast* v. *Drew,* supra; 24 Am. Jur. 734, Gifts, § 7; 38 C.J.S. 907, Gifts, § 89; note, 99 Am. St. Rep. 890, 906. The expectation of death need not be an apprehension of immediate death, but the apprehension itself must be immediate. 38 C.J.S. 900, Gifts, § 78; see *Braun* v. *Brown,* 14 Cal. 2d 346, 127 A.L.R. 773 & note, 780; *Pikesville National Bank & Trust Co.* v. *Shirley,* 281 Ky. 150, 126 A.L.R. 919; *Ray* v. *Leader Federal Savings & Loan Assn.,* 40 Tenn. App. 625, 60 A.L.R.2d 564; Gulliver & Tilson, "Classification of Gratuitous Transfers," 51 Yale L.J. 1, 23.

An apprehension of death arising from the prospect of a surgical operation to which the donor intends voluntarily to expose himself, if such operation is made necessary by a present disease, may be sufficient to fulfil this essential of a valid gift causa mortis; likewise, an apprehension of death arising

from the contemplation of a journey by an aged or feeble person, the gift being on condition that the donee is to have the property if the donor does not come back or anything happens to him. 24 Am. Jur. 734, Gifts, § 6; see *Begovich* v. *Kruljac*, 38 Wyo. 365, 60 A.L.R. 1046. It is not necessary that the gift be made while the donor is in extremis or confined to his bed or his room, and there is no limit of time within which the donor must die to make such a gift valid, if death is caused generally from the illness or ailment or an existing disorder which the donor had at the time the gift was made, and death from a surgical operation made necessary by a present disease is death from the disease. See *Ridden* v. *Thrall*, 125 N.Y. 572; note, 99 Am. St. Rep. 890, 905-907; 24 Am. Jur. 734, Gifts, § 6; 38 C.J.S. 900, Gifts, § 78.

The circumstances surrounding the giving of the keys to the safe deposit boxes by the decedent on September 8 lead to the conclusion that they were given to the plaintiff in contemplation of the conceived approach of the decedent's own death. The decedent, aged seventy-two, had suffered a serious fracture of her hip which required hospitalization. Her husband was dead. She lived alone. She was aware of the seriousness of such a major bodily injury at her age and that in all probability she would require an operation. She regarded the plaintiff as her daughter and closest to her. On the way to the hospital, she asked that the ambulance be stopped at her home. She instructed the plaintiff to get the note, which was prepared a year before, and the only keys to the safe deposit boxes. The keys and boxes had belonged to her husband when he was alive. The contents of the safe deposit boxes, chiefly the common stock of the Great Atlantic and Pacific Tea Company, had come to her by will from her husband, who was the plain-

tiff's father, and the plaintiff was his only child. The note contained instructions as to the decedent's burial. It was directed to the plaintiff as the decedent's "last wishes." The decedent told the plaintiff to keep the keys if anything happened to her. These words indicated an intent not only to make a gift but that the gift was to take effect only upon her death. No particular words of gift are necessary. See *Johnson* v. *Colley,* 101 Va. 414. All of these circumstances indicated an immediate apprehension of death, which did result from the condition which she was suffering at the time. The fractured femur which caused her entry into the hospital caused a pulmonary edema and finally, eleven days later, resulted in a cerebral hemorrhage.

Clearly, there was a delivery of the keys. The decedent parted with possession of the only instrumentality available to gain access to the safe deposit boxes, and the language used indicated that the gift was not to take effect until the death of the donor. See 24 Am. Jur. 745, Gifts, § 28. The plaintiff has sustained her burden of proof for a valid gift causa mortis of the two keys to the safe deposit boxes, and she is, therefore, the owner of them and under the stipulation referred to above entitled to the contents of the safe deposit boxes represented by the keys.

Insofar as the savings bank passbooks are concerned, the requirements of a valid gift causa mortis to her have also been proven by the plaintiff. On September 15, 1960, when the decedent delivered the savings bank passbooks to the plaintiff, the decedent had been in the hospital seven days. A hip operation had been performed, and she had asked the plaintiff on several occasions if she was going to die. The contemplation of the conceived

approach of death formed on September 8 continued until this date and was a well-reasoned belief. She knew that her attending physician, Dr. Sweet, had recommended a consultation with another doctor. She was in pain. Again, she told the plaintiff to take the bankbooks with her and to keep them if anything happened to her, the decedent. This meant that the plaintiff was to have them upon the decedent's death. There was a delivery of the passbooks to the plaintiff. See *Camp's Appeal,* 36 Conn. 88; *Flynn* v. *Hinsley,* 142 Conn. 257, 261. There was an intent to make a gift of the passbooks to her to take effect upon the decedent's death. The essential necessary for a valid gift causa mortis of the two savings bank passbooks has been established by the plaintiff. There was an apprehension of the conceived approach of death by the decedent. She died four days later.

The issues are found, and judgment may be entered, for the plaintiff on the complaint and cross complaint, declaring that the plaintiff is the owner and entitled to safe deposit key No. 340, Deep River Savings Bank, Deep River, Connecticut, and she is the owner and entitled to the contents of said safe deposit box in said bank; further declaring that the plaintiff is the owner and entitled to safe deposit key No. 209, Hartford National Bank and Trust Company, Old Saybrook Office, Old Saybrook, Connecticut, and is the owner and entitled to the contents of said safe deposit box in said bank; further declaring that the plaintiff is the owner and entitled to the passbook representing account No. 11181, Berlin Savings Bank, Kensington Branch, Berlin, Connecticut, and is the owner and entitled to the moneys on deposit in said account in said bank; and further declaring that the plaintiff is the owner and entitled to the passbook representing account No. 11878, Deep River Savings Bank, Deep River, Con-

necticut, and is the owner and entitled to the moneys on deposit in said account in said bank.

Costs may be taxed in favor of the plaintiff.