# IN RE KING'S ESTATE
## SECURITY-FIRST NAT. BANK OF LOS ANGELES, CAL., v. KING ET AL.

(No. 1909; May 5, 1936; 57 Pac. (2d) 675)

For the plaintiff in error there was a brief by *G. J. Christie* of Lander, Wyoming, and *Lucius F. Chase,* of Los Angeles, California, and oral argument by *Mr. Christie.*

456

For the defendants in error, there was a brief and the case was argued orally by *A. H. Maxwell* of Lander and *Bryant S. Cromer* of Casper.

*G. J. Christie* and *Lucius F. Chase* in Reply.

458

BLUME, Justice.

The Security First National Bank of Los Angeles, general executor of the estate of Charles Henry King, deceased, filed in the district court of Fremont County its petition against Leslie L. King and Theodore Becker, ancillary executors of the estate of Charles Henry King, deceased, in Fremont County, to compel the ancillary executors to list in the inventory filed by the latter in the said estate certain personal property, namely, 499 shares of the capital stock of the King Investment Company, 61 shares of the capital stock of the Riverton Lumber Company, 74 shares of the capital stock of the Shoshoni Lumber Company, certain shares of the capital stock of the Omaha Wool and Storage Company, certain indebtedness of the King Investment Company to the estate in the sum of $51,844.44, and certain indebtedness from Leslie L. King to the estate of the deceased. The ancillary executors answered the petition, denying that any of the property mentioned was and is the property of the estate of the deceased. The trial court refused to determine the issues thus made, and its order to that effect was reversed by this court in the case of Security First National Bank v. King, 46 Wyo. 59, 23 P. (2d) 851, and the cause was remanded to the district court with direction to proceed to determine the issues made. That was done later. The issues were determined against the petitioner, and from that judgment it has appealed. The Security First National Bank will ordinarily be referred to herein as the plaintiff and the ancillary executors as defendants, unless otherwise specifically mentioned.

The deceased, Charles Henry King, died in Los Angeles, California, on February 28th, 1930, leaving surviving him Leslie L. King, a son, one of the ancillary executors above mentioned, another son Charles B. King, of Los Angeles, two daughters, Gertrude M. Knittle and Marietta Hughes Kellogg, of Los Angeles,

Savilla J. Pettis, a daughter, of Omaha, Nebraska, his widow, Martha Allis King, and some grandchildren. He made his will in 1924, disposing of all of his property, including that in controversy here. He lived most of his life in Fremont County, Wyoming, where he accumulated considerable property. He moved to California about 1922, and never after that returned to Wyoming. He left in charge of his property Leslie L. King, his son, and Theodore Becker, his confidential and private secretary, and secretary also of several of the corporations in which the deceased was interested. The inventories made by Becker at the end of each year showed the following values of property owned by deceased: for 1924, about $311,000; for 1925, about $398,000; for 1926, about $277,000; for 1927, about $196,000; for 1928, about $122,000; for 1929, about $104,000.

During his life time the deceased owned some shares of stock in the First State Bank of Riverton. That bank became insolvent prior to 1925. He had, apparently, also been a director of the bank. It was seemingly claimed by the attorney for the receiver that he had been a director during the years prior to the insolvency of the bank and that he should be held responsible for some of the bad loans which had been made by the bank. The claim thus made was communicated to the deceased in Los Angeles, by both Becker and by Leslie L. King, and they both advised him that it would be better to transfer his property in Wyoming, so that he could not be reached except in California. At times they advised him to transfer this property to Leslie L. King, at times to whatever party he might deem advisable. Legal talent was employed and the deceased was advised during 1925 that he was not in any way liable. It appears, however, that he was worried by this claim, and that nearly up to the time of his death. He was physically ill for a number of

years before he died, being afflicted with diabetes and some heart trouble. No serious claim, however, is or can be made that he was not mentally sound clear up to the time of his death. These matters are mentioned because of the claim of the plaintiff herein that the transfers hereinafter mentioned were made for the purpose of avoiding any attachments against the property of deceased in Fremont County, Wyoming.

1. Among the properties owned by the deceased during his lifetime were 498 shares of stock in the King Investment Company. That company had a capital stock of $50,000. One hundred shares of the stock had been transferred to Leslie L. King, and the latter's ownership thereof cannot be seriously questioned, since it was owned by the consent and with the knowledge of his father, the certificate being signed by the latter as president. Deceased also owned the stock in the lumber companies heretofore mentioned. The evidence in the case bearing upon stock in these three companies is very much alike, and they will, accordingly, be considered together. Becker was secretary of all three companies. Letters were addressed to the latter, purporting to be dated December 2, 1925, signed by the deceased, directing him to cancel the decedent's stock in these companies and make out new stock in the name of Leslie L. King. The letters were not acted upon at that time, and were not, in fact, received by Becker for a number of months after their date. Nor were the stocks mentioned therein in the possession of the deceased at that time, but were then pledged with the Merchants National Bank of Omaha. On April 16, 1926, Leslie L. King wrote his father the following letter:

"My dear Father:

Herewith please find enclosed letters for you to sign. Now Father, I wish you would do this in case anything happens to you for my protection. Things out there I

am afraid if anything happens to you will be in a terrible mix up with Mother in her frame of mind. I am sure father you want me to build up in this country and God knows I am trying hard to save things for my future, and carry things along and not throw the money away. In your will you are to give me the Lumber Co. stocks anyhow, and the King Invest. Co. stock will prevent anyone to come in and ruin the Co. Now you know as long as you live it will be yours. I don't want to have a lot of trouble about in case you die and besides it will save me or you a big State tax and inheritance tax. So why give it to the Government. Now please do this for me so I won't be left stranded and a awful battle to fight. I have never asked you before to do this but I feel that it is a protection to me. As you know I have been strictly on the square with you and expect to continue. Your will provides for it any how so why not save me the money now. Please do this for me, it is my only request. With much respect

Your son

Leslie."

On September 28, 1926, the following letter was written, to-wit:

"Los Angeles, Calif., September 28, 1926.

My dear Becker:

I have been thinking that the King Investment Company should have in its files some memorandum concerning the condition of the title to the stock which, as you know, I assigned and delivered to Leslie on or about the 1st day of December, 1925. As you are aware, this stock was transferred to him in consideration of services rendered, and with the understanding that I should retain my connection with the company as long as I should live and should receive any dividends which might be paid on the stock during my lifetime. With this exception, the stock has been regarded ever since as his absolute property, the certificates have been at all times since in his exclusive possession and under his absolute control. We have all understood the matter perfectly and have acted accordingly. But it occurs to me that the company should have in its files some evi-

dence of the transaction over my own signature. The same situation exists as to the stock of the Riverton Lumber Company and the Shoshoni Lumber Company. I am therefore addressing you practically identical letters for each company. Please file and keep each letter in the records of the proper company.

Yours truly
Charles Henry King."

An identical letter was written also concerning the Shoshoni Lumber Sompany stock and the Riverton Lumber Company stock. These letters, according to Becker's testimony, were received about October 1, 1926. These stocks, however, referred to as having been transferred, were at that time and until November 4, 1926, still pledged with the Merchant's National Bank at Omaha. These letters, counsel for plaintiff surmise, were written in response to the letter written by Leslie L. King to his father on April 16, 1926. On May 13, 1927, Leslie L. King wrote to his father as follows:

"Dear Father:

I am in receipt of your letter on May 9th in regard to sending you a report carrying out your wishes according to your will leaving you $50,000.00 you will herewith find enclosed copy of your last financial statement. Now then if you would give me the King Investment Co. stock also the Lumber Companies' stock it would leave you over $220,000.00 according to this statement or in other words it would leave about $174,-000.00 to be distributed to the balance of the family. Mr. Becker says that you have the copy of your will in your desk. Will you kindly get the same and send it to us? Now in regard to your saying that in case you decide to do this with these stocks that it is not to go into effect until 6 months after your death that would be impossible because it would be your property and it would have to go into your estate. Kindly let me hear from you and send the copy of the will.

Yours truly
Leslie King."

Apparently in answer to that letter, the deceased wrote to Leslie L. King as follows, on June 21, 1927:

"My dear Leslie:

You will find as you request and as long as I live we understand it is my property and under my control and all dividends to come to me. Now then, Leslie, you must have Becker attach to my will, a codicil cutting you out of the will as they will bring suit and it will not stand in law. Both ways the lawyers will get this will and raise hell. So you do not want any trouble. You know you are provided for under the will. Don't take a chance in this matter.

Father."

Up to this time no transfer of the stock mentioned in these letters had been made, and whatever gift was intended was not delivered. It may be that the letters of December 2, 1925, and of September 28, 1926, were at least partially intended for the purpose of protecting the stock against any attachment, although they also evince a disposition of willingness to transfer the stock to Leslie L. King. It is hardly probable that the letter of June 21, 1927 was written because of any fear of attachments. It is contended, however, that this letter shows clearly that the deceased reserved complete ownership of the stocks. The letter, however, we think, must be construed in connection with prior and subsequent acts. The stocks were actually transferred about December 1, 1927. The certificates of the King Investment Company stock held by the deceased were assigned by him on the back thereof in blank and delivered to the Secretary and a new certificate was issued to Leslie L. King, signed by the deceased himself as President of the Company and by Theodore Becker as Secretary. The shares of stock in the lumber companies were assigned on the back thereof by the deceased to Leslie L. King, delivered to the Secretary of the companies, and new stock was thereupon issued to Leslie L. King. That was a sufficient delivery of the

property to the assignee. Phillips v. Plastridge, 107 Vt. 267, 179 Atl. 157; 99 A. L. R. 1074. It appears further in the evidence that the deceased stated a number of times that he would give to Leslie L. King more of his property than to any other of his children.

Counsel for plaintiff contend that the burden of proof to show a gift is upon Leslie L. King and that this has not been sufficiently met. The intent to give, and delivery of the property, seem to be shown clearly enough. Nor is the burden of proof quite as claimed by counsel. The cases cited by them relate all, except one, to gifts between strangers. In such case the gifts must be clearly shown. But when one between parent and child is involved, the rule is that when "a parent places personal property in the possession of a child and the child retains possession, the presumption (or inference) is that a gift is intended." 28 C. J. 672; 48 C. J. 1321. This is subject to the qualification that "where the parent is enfeebled in mind and body, from age or other cause, and in a situation rendering probable the exercise of undue influence on the part of the child, the burden of proof rests upon the child to show that the gift was the voluntary, intelligent act of the donor." 48 C. J. 1322. Such dominant position, however, is not to be presumed from the relationship of the parties alone. 46 C. J. 1322. In the case at bar there is much evidence that the deceased had a keen and sound mind up to the time of his death. There is nothing in the evidence to show that Leslie L. King had a dominant influence over his father. The latter lived in Los Angeles, the former in Wyoming. The transfers were effected as a result of correspondence through the mails. The deceased had three other children living in Los Angeles. A considerable period of time intervened after Leslie L. King wrote his letters before the deceased answered them, and before he actually acceded to the request made by his son. Nor are we able to see

that, simply because Leslie L. King managed the affairs of the deceased in Wyoming, the trial court was required to find that Leslie L. King stood in a fiduciary relation to the deceased, so far as the transfers herein mentioned are concerned. The main influence which such management could have had upon the deceased would be by reason of the greater affection of the father for his son arising therefrom. The parties, in dealing with each other in the manner already mentioned, dealt with each other at arm's length, in so far as that can be said to be true between parent and child. We think, therefore, without referring to any conflicting evidence adduced by the plaintiff herein, that the trial court was warranted in finding that the transfers were made as a gift pursuant to the love and affection which the deceased had for Leslie L. King, and that such holding is supported by substantial evidence. We think that we must arrive at the same conclusion with reference to the 150 shares of stock of the Omaha Wool & Storage Company, standing in the name of Leslie L. King, issued to him in August, 1922, and signed by the deceased as president of the company; with reference to the 100 shares of stock of the King Investment Company, issued to Leslie L. King in 1922, and signed in like manner, and with reference to the one share of stock in each of the corporations heretofore mentioned, issued to Leslie L. King prior to 1922, and none of which were claimed by the deceased after the issuance thereof.

2. The statement of resources submitted by Becker to the deceased for the year 1927 disclosed that the King Investment Company owed the deceased the sum of $49,700. The plaintiff desires to reach that indebtedness and have it included in the inventory of the ancillary executors. It is apparent from the record that the deceased realized that there would be an inconsistency in his action in transferring the stock of the King In-

vestment Company to his son, and yet leave an indebtedness of the amount named against the company, since this indebtedness was substantially equivalent to the whole of the capital stock of the company. On August 16, 1926, he wrote Becker what he should do with the credit then existing. In the early part of 1928, after having transferred the stock of the company to his son, he wrote the following letter, to-wit:

"King Investment Co.,
Riverton, Wyoming

Dear Sirs:

According to your books the company is indebted to me personally to a considerable amount, as a matter of fact this obligation has been fully discharged as you know.

I am writing this letter to be preserved in your files and in order that you may have in your possession a receipt in full in the event that any questions should subsequently arise because of the apparent indebtedness to me disclosed by your books as they now stand.

Yours truly
Charles Henry King."

In accordance with the direction contained in this letter the secretary of the company charged off the credit then standing in favor of the deceased, and sent a statement to that effect to him. We think that this letter sufficiently evidences a gift from the deceased to the King Investment Company, and therefore, indirectly, a gift to Leslie L. King. A receipt of an indebtedness is sufficient to evidence a gift thereof. 28 C. J. 666; Fassett's Appeal, 167 Pa. 448, 31 Atl. 686; notes in 37 A. L. R. 1147, 84 A. L. R. 385.

3. Plaintiff also claims that Leslie L. King owes the deceased the sum of $24,299.21, paid to him at various times from 1925 to 1930, in addition to a salary of $3000 per annum. The trial court had considerable doubt in connection with this claim, and so have we.

The delivery of this amount cannot be questioned, and the only point which arises is as to the intent to make a gift thereof. There was some testimony by a colored chauffeur of the deceased that the deceased expected money advanced to Leslie L. King to be repaid. His testimony does not show the amounts thereof. There is a letter in the record, dated July 9, 1929, written by the deceased to Leslie, containing the statement: I * * * sent you money and I am unable to get it back from you." This is claimed as showing the state of mind of the deceased. Reading the letter as a whole, however, it does not relate to the money advanced to Leslie, but to money sent Leslie and Becker for investments, which, as Leslie had advised, could not be collected on account of the depressed conditions in Fremont County. The payments, amounting to the total above mentioned, were paid over a period of years. No note or other evidence of indebtedness was ever executed by Leslie, or asked by the deceased, whereas, at least in one instance, he received a note from Charles B. King.

Becker testified:

"Yes, I testified that Leslie received a salary of $3000 a year. It wasn't done all the time that way. Mr. King paid Leslie's bills. It was always charged to Leslie King and at the end of the year charged off. The $3000 wasn't always charged to salaries. For years it wasn't done in that way; there was no salary credited to him. Mr. King just paid his bills."

The witness further testified that he was in constant communication with the deceased, often sent him statements once a month and a complete statement at the end of the year. Presumably these complete statements contained the charge-off mentioned in his testimony, and no objections seem to have been made thereto. Leslie was not the only child to whom payments were made. In 1925, there was paid to Leslie L. King the sum of $3148; at the same time there was

paid to C. B. King, another son, the sum of $328, and to Mrs. G. M. Knittle, a daughter, the sum of $1250. In 1926, there was paid to Leslie L. King $3171, and to Mrs. Knittle the sum of $925. In 1927 there was paid to Leslie L. King the sum of $5108, to C. B. King the sum of $204, and to Mrs. Knittle the sum of $900. In 1928 there was paid to Leslie L. King the sum of $5873, to C. B. King $475, and to Mrs. Knittle the sum of $900. In 1929 there was paid to Leslie L. King the sum of $6979, to C. B. King, $8744, and to Mrs. Knittle the sum of $750. Various payments were also made from time to time to Mrs. Kellogg, a daughter, though in small amounts. The inference may be drawn from the delivery of the money that it was an advancement or a gift. 46 C. J. 1321. And while we are not altogether satisfied, we have concluded that we are not warranted in rejecting the finding of the trial court.

4. Plaintiff also claims that the ancillary executors should account for a Lincoln automobile. The evidence on this point is very unsatisfactory, even more so than that on the point just previously considered. We shall not attempt to go into all of the details shown by the record. A Lincoln automobile was bought by Leslie L. King in 1925 with his father's money for approximately the sum of $3500, a Packard car being traded in and $2000 being paid in cash. The car was by the deceased considered to be his. It seems to have been sold or traded in later, Leslie having one or two new Lincoln cars thereafter. We are satisfied from the record that the deceased, shortly before his death, considered a Lincoln car then or shortly previously in the possession of Leslie to be his. The first car or its value is not traced into the second or third. But the whole matter is so peculiarly within the knowledge of Leslie L. King, one of the ancillary executors herein, that the burden of explanation was on the defendants. That explanation has not been forthcoming. It has not even

been shown in whom was the title to the first, second or third Lincoln cars. Considering the whole record, and without going into further details, the ancillary executors should be charged with the Lincoln automobile in Leslie L. King's possession at the time of the decedent's death, and with a value fixed as of the time of the death; if he had no Lincoln car at that time, the ancillary executors should be charged with the Lincoln car last in possession of Leslie L. King prior thereto, the value thereof to be fixed as of the time of the disposition thereof. In the absence of a showing of a value to the contrary by the ancillary executors, it should be fixed at the sum of $3500.00.

The judgment of the trial court is, accordingly, modified as herein mentioned, and as so modified, it is affirmed. One fifth of the costs in this court will be taxed to the defendants, four fifths to the plaintiff, and no costs to be taxed for the briefs.

*Modified and affirmed.*

KIMBALL, CH. J., and RINER, J., concur.