44 P.3d 41 (2002)
2002 WY 53
Andina Marie STANG, a/k/a Andina Marie Ramsey and Kevin Ramsey, Appellants (Defendants),
v.
Timothy McVANEY, as Guardian for Shannon McVaney, and Kristopher McYaney, Appellees (Plaintiffs).
No. 01-107.
Supreme Court of Wyoming.
April 10, 2002.
*43 Fred W. Phifer, Wheatland, WY., Representing Appellants.
Kendal R. Hoopes of Yonkee & Toner, Sheridan, WY., Representing Appellees.
Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.
*42 VOIGT, Justice.
[¶ 1] The First Interstate Bank of Sheridan (the Bank) filed an interpleader action on December 7, 2000, to determine the ownership of a payable on death certificate of deposit (CD). Mike Keeler (Keeler), the CD's purchaser, had named his great niece and nephew, Shannon and Kristopher McVaney (the appellees), as payees under the CD. Keeler committed suicide on November 4, 2000. An undated letter purportedly written by Keeler changing the names of the payable on death payees to Andina Marie Stang and Kevin Ivan Ramsey (the appellants) arrived at the Bank two days after Keeler's death. The McVaneys, Stang, and Ramsey all claim ownership of the CD. Stang and Ramsey appeal the district court's granting of the appellees' motion for summary judgment. We affirm.

ISSUES
[¶ 2] The appellants state the issues as:
1. Was the delivery of the request for change of beneficiary on the Certificate of Deposit complete when it was mailed with the original Certificate of Deposit one day prior to the owner of the CD committing suicide and was received by First Interstate Bank of Sheridan on the first business day after it was mailed?
2. Did the trial court err in granting Appellees' Motion for Summary Judgment?
3. Did the trial court err in awarding the Certificate of Deposit to the Appellees?
4. Did the depositor and owner of the Time Certificate of Deposit, Mike Keeler, have the right and the authority to change the "Payable on Death" names at any time during his lifetime?
The appellees present the following issues:
1. Whether Shannon and Kristopher McVaney, who were the payable-on-death payees on the certificate of deposit at the time of death of Mike Keeler, are the owners of the funds represented by the certificate of deposit.
2. Whether the request for a change of the payable-on-death payees on the certificate of deposit was effective in changing the terms of the account when it was not received by First Interstate Bank until after the death of Mike Keeler.

*44 3. Whether Mike Keeler's request for a change of the payable-on-death payees constitutes an inter vivos gift or a gift causa mortis.[1]

FACTS
[¶ 3] The Bank filed an interpleader action in the District Court of the Fourth Judicial District to determine the ownership of approximately $30,000.00 held as a CD by the Bank. The action named Shannon McVaney, Kristopher McVaney, Andina Marie Stang, and Kevin Ivan Ramsey as defendants. Because Shannon McVaney was a minor, the district court appointed her father, Timothy McVaney, as her guardian for purposes of the lawsuit.
[¶ 4] Keeler had obtained a CD at the Bank of Commerce, now First Interstate Bank, on May 10, 1982. At that time, Keeler named his sister, Velta Schaefer, as the payable on death beneficiary. On December 3, 1998, Keeler gave the Bank written instructions to reissue the CD making it payable on death to the appellees. The Bank complied with those instructions.
[¶ 5] The relevant facts in this case are not complex. Keeler met Stang, a waitress, at the Breakfast Inn restaurant in Wheatland where he went for breakfast every day at 5:00 a.m. They became friends. When he failed to show for breakfast one morning, Stang went to check on him. He was ill, and she rushed him to a hospital. Stang began taking care of Keeler on a daily basis starting in February 1995. She took him to doctors' appointments, picked up his prescriptions, took him to the hospital, took him shopping, cleaned his house, did his laundry, cooked him dinner, and occasionally made him breakfast. Stang also provided home health care pursuant to his doctors' and nurses' instructions. Stang received no compensation for her services during the first four years she cared for Keeler. The last two years before his death, she received between $600.00 and $700.00 per month, depending upon the amount Keeler could afford.
[¶ 6] During August 2000, Keeler allegedly requested that Stang prepare a letter to the Bank to change the payable on death beneficiaries from the McVaneys to Stang and her husband, Kevin Ramsey. Stang stated in an affidavit that she did not write the letter because she did not want to cause problems between Keeler and his family. Stang further stated in her affidavit that on November 3, 2000, Keeler insisted that Stang write the letter, and insisted that she take him to the post office that day to mail it. The next day, Keeler, age 77, shot and killed himself.
[¶ 7] Two days after his death, on November 6, 2000, the Bank received an undated typed letter purportedly from Keeler, directing the Bank to change the payable on death beneficiaries from the McVaneys to Stang and Ramsey. Without knowledge of Keeler's death, the Bank issued a new CD naming Stang and Ramsey as the payable on death beneficiaries. Stang notified the Bank of Keeler's death on November 10, 2000. Because there were multiple claims to the CD, the Bank filed an Interpleader Complaint to determine ownership of the CD.
[¶ 8] The McVaneys answered the Interpleader Complaint and filed a cross-claim against Stang and Ramsey on January 11, 2001. The cross-claim alleged that the McVaneys were the rightful owners of the CD. Stang and Ramsey filed an answer to the cross-claim and also brought a cross-claim against the McVaneys. Both cross-claims sought the district court's determination of the CD's ownership. The district court dismissed the Bank from the action without prejudice on May 3, 2001. The district court then realigned the parties; McVaneys as plaintiffs, Stang and Ramsey as defendants.

DISCUSSION
[¶ 9] The appellants' first issue is whether delivery of the letter requesting the change in beneficiary was completed when it, along with the original CD, was mailed to the Bank. The appellants argue that delivery was *45 effective when Keeler placed the written request with the original CD in a properly addressed envelope, with correct postage, and placed it in the mail. The appellants assert that this created a gift causa mortis, and title to the CD passed to the appellants upon Keeler's death.
[¶ 10] CDs are inherently contractual, and if they are non-negotiable, as in the instant case, they are to be construed in light of general contract law principles. Rose v. Rose, 849 P.2d 1321, 1324-25 (Wyo.1993). A change in title to a CD in effect terminates the existing account and replaces it with a new one. Washington County Mercantile Bank v. Kennedy, 855 S.W.2d 520, 523 (Mo.App.1993). Therefore, changing the payable on death beneficiaries from the McVaneys to the appellants would have terminated the existing account and created a new contract between the parties. Keeler's request to alter the terms of the CD was an offer for a new contract, which the Bank had yet to accept at the time of Keeler's death.
[¶ 11] In contract law, the mailbox rule provides that unless otherwise agreed to or provided by law, an offer is accepted when the acceptance is properly addressed and placed in the mail. Liquorama, Inc. v. American Nat. Bank and Trust Co. of Chicago, 86 Ill.App.3d 974, 41 Ill.Dec. 951, 408 N.E.2d 373, 375 (1980); Black's Law Dictionary 964 (7th ed.1999). In the situation before this Court, the mailbox rule would apply not to Keeler's letter, but to the Bank's response, if such had been mailed. Keeler mailed an offer to the Bank. A new contract could not be created until acceptance by the Bank.
[¶ 12] We do not believe that a gift causa mortis was created. A gift causa mortis is effected if the following conditions are met: "There must be a clear and manifest intention of the owner to give, a subject capable of passing by delivery, and an actual delivery at the time, in contemplation of death." Hecht v. Shaffer, 15 Wyo. 34, 85 P. 1056, 1057 (1906). The burden of proving a gift causa mortis is on the alleged donee, and it must be shown by clear and convincing evidence. Where the donee is not a relative, positive and unequivocal proof is necessary. In re King's Estate, 49 Wyo. 453, 57 P.2d 675, 678 (1936). This Court has stated:
[I]t does not follow that gifts causa mortis can be made more easily than the other gifts, for an additional compensating requirement becomes necessary in connection with the former not found in connection of the latter, and that is the showing that the gift was made in contemplation of death, so as to lend credibility to the making of the gift.
Begovich v. Kruljac, 38 Wyo. 365, 267 P. 426, 430 (1928).
[¶ 13] Whether Stang and Ramsey sustained their burden of proof was for the district court to determine. We will not reverse such a finding unless it was manifestly against the weight of the evidence. Produit v. Produit, 2001 WY 123, ¶ 18, 35 P.3d 1240, 1245 (Wyo.2001). Other than the fact that he killed himself the next day, there is nothing in the record of the instant case to indicate that Keeler's "gift" of the CD to the appellants, if such it was meant to be, was made in contemplation of death. The first indication that Keeler was thinking about suicide occurred on November 4, 2000, the day after the letter was written. Stang stated in her affidavit:
At approx. 10:45 when I got to Mike's [the decedent] house he had his gun in his hand, I told him to put the gun away. He told me the pain wouldn't stop and I asked him to please take the pain pill like Dr. Thalkin told him to do, I broke his percocet in half and gave him one half to take. I asked Mike again to put the gun away and I told him that I would leave if he didn't. Mike ignored me and I turned to leave and he shot himself.
[¶ 14] With nothing more in the record, the district court could reasonably conclude that there was no contemplation of death on November 3, 2000, meaning that this element of a gift causa mortis was not sufficiently proved. Unless all of the elements of a gift causa mortis are met, the gift fails.
[¶ 15] The next issue raised by the appellants is whether the district court erred in granting the appellees' motion for summary *46 judgment.[2] Summary judgment motions are determined under the following language from W.R.C.P. 56(c):
The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
[¶ 16] The purpose of summary judgment is to eliminate the necessity of formal trials where only questions of law are involved. Blagrove v. JB Mechanical, Inc., 934 P.2d 1273, 1275 (Wyo.1997). The initial burden is upon the movant to demonstrate that there is no genuine issue of material fact. Hronek v. St. Joseph's Children's Home, 866 P.2d 1305, 1307 (Wyo.1994). A fact is material if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense. Id. If a prima facie showing is made that there is no genuine issue of material fact, and that the movant is entitled to judgment as a matter of law, the burden then shifts to the party opposing the motion to present specific facts showing that a genuine issue of material fact exists. Boehm v. Cody Country Chamber of Commerce, 748 P.2d 704, 710 (Wyo.1987).
[¶ 17] Where a party has made a prima facie showing in favor of summary judgment, it takes more than "`a scintilla of evidence in support of the [other party's] position ... to defeat a properly supported motion for summary judgment.'" Moncrief v. Williston Basin Interstate Pipeline Co., 880 F.Supp. 1495, 1505 (D.Wyo.1995), aff'd in part, rev'd in part, and remanded on other grounds, 174 F.3d 1150 (10th Cir.1999) (quoting Moya v. United States, 35 F.3d 501, 503 (10th Cir.1994)). "A party must affirmatively set forth material facts in opposition to a motion for summary judgment. He cannot rely only on his allegations and pleadings." Hyatt v. Big Horn School Dist. No. 4, 636 P.2d 525, 530 (Wyo.1981). Pleading allegations do not create an issue as against a motion for summary judgment supported by affidavits. W.R.C.P. 56(e); Vipont Min. Co. v. Uranium Research & Development Co., 376 P.2d 868, 870 (Wyo.1962).
[¶ 18] Upon hearing the respective summary judgment arguments of counsel and upon review of the record, the district court found that there was no genuine issue as to any material fact and that the appellees were entitled to judgment as a matter of law. The appellants argue that there are genuine issues of fact concerning ownership, intent, and delivery of the CD. There is no doubt that Keeler owned the CD, and during his lifetime he could change the beneficiaries, as he did from his sister to the McVaneys in 1998, with written notification to the Bank. It is well established in contract law, on the other hand, that the death of either party before acceptance is communicated causes an offer to lapse. 17 C.J.S. Contracts § 65(c) at 527-28 (1999); First Home Sav. Bank, FSB v. Nernberg, 436 Pa.Super. 377, 648 A.2d 9, 15 (1994). In the instant case, while it might have been Keeler's intent to change the names of the beneficiaries, the offer to do so had not even been received by the Bank, so the Bank had certainly not communicated its acceptance of the offer, and the offer lapsed upon Keeler's death on November 4, 2000.
[¶ 19] The appellants rely on the mailbox rule to argue that the offer was effectively delivered when it was mailed. We earlier discussed the mailbox rule, and need not address it again. However, even if this constituted effective delivery, as a matter of law, the purported request to change the payable on death beneficiaries to the appellants is not enforceable because it was received by the Bank after Keeler's death.
A party may alter the terms of the account by a notice signed by the party and given to the financial institution to change the terms of the account or to stop or vary payment under the terms of the account. To be effective, the notice must be received by the financial institution during the party's lifetime. *47 Uniform Multiple-Person Accounts Act § 13(a), 8B U.L.A. 22-23 (2001) (emphasis added). An account may be altered "`by written order given by a party to the financial institution to change the form of the account.' . . . The request must be signed by a party and received by the bank during a party's lifetime." In re Conservatorship of Gobernatz, 603 N.W.2d 357, 360 (Minn.App. 1999) (quoting Minn.Stat. § 524.6-205). We agree with the district court that summary judgment was appropriate and the funds represented by the CD should be awarded to the appellees.

CONCLUSION
[¶ 20] Under the contract existing between Keeler and the Bank, ownership of the CD vested in the appellees upon Keeler's death. That contract was not amended by Keeler's unilateral action prior to his death. Further, there was insufficient proof that Keeler's conduct was in contemplation of death, so the elements of a gift causa mortis were not proven. The decision of the district court is affirmed.
NOTES
[1] The appellants have not argued that this was addressed. an inter vivos gift, so that theory will not be addressed.
[2] In large part, this is the same issue that has just been addressed. Because the appellants treat the matter as two separate issues, we will do likewise.